UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

KYLE B. RICHARDS,

              Petitioner,             Case No. 2:20-cv-22

v.                              Honorable Robert J. Jonker

KRIS TASKILA,

              Respondent.
_____/

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

## Discussion

### I.    Factual allegations

Petitioner Kyle B. Richards is incarcerated with the Michigan Department of Corrections at the Baraga Correctional Facility (AMF) in Baraga County, Michigan. On October 20, 2014, following a one-day jury trial in the Ionia County Circuit Court, Petitioner was convicted of assault of a prison employee—Petitioner spat on an MDOC Corrections Officer—in violation of Mich. Comp. Laws § 750.197c. On December 16, 2014, the court initially sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to a prison term of 4 years, 2 months to 40 years. On May 1, 2018, following an order of remand from the Michigan Court of Appeals, Petitioner was resentenced, again as a fourth habitual offender, to a prison term of 3 years, 10 months to 40 years.

On February 20, 2020, Petitioner filed his habeas corpus petition raising six grounds for relief, as follows:

I.     Mr. Richards was deprived of his constitutional right to self-representation by the trial court's summary denial of his timely request to go *pro se*.

II.    Mr. Richards was denied his due process rights by the destruction of evidence in bad faith.

III.   Mr. Richards's due process rights were violated by the trial court and state prosecutor who failed to provide timely written notice of "habitual charges" in accordance to Mich. Comp. Laws § 769.13.

IV.    The trial court failed to impose a sentence that is proportionate to Mr. Richards's circumstances and the circumstances of his offenses.

V.     A sentence near the top of the sentencing guideline range constitutes cruel and unusual punishment for an offender with serious mental health problems.

VI.    The top end of the sentence for spitting on a guard is cruel and unusual because with [Mr. Richards's] condition of Asperger's Syndrome, 40 years is a death sentence.

(Pet., ECF No. 1, PageID.5-10, 16, 24, 29, 37, 45, 50, 57.)

The Michigan Court of Appeals described the facts underlying Petitioner's offense

as follows:

> On January 3, 2013, corrections officers Christopher Balmes and Christopher Hudson escorted defendant to the segregation unit. Balmes, the victim in this case, testified that he had not previously dealt with, seen, or heard of defendant before January 3, 2013. According to the victim, defendant was handcuffed behind his back, and Hudson and the victim were each on one side of defendant holding one of his arms while escorting him. The victim testified that defendant was not yelling but that he seemed upset. Hudson testified that defendant made some statements directly to him during the escort. Hudson further testified that defendant made a comment that the officers would not be able to do anything if he assaulted them. The victim testified that they first took defendant to the shower because, before inmates go to the segregation unit, they are strip-searched in the shower to make sure they do not have any contraband. Once they arrived at the shower cell, defendant was placed into the shower cell. The victim testified that the door closed behind defendant and automatically locked.
>
> According to the victim, he turned to walk away after defendant was placed in the shower cell, and defendant "crouched down next to an opening in the wall [known as a 'restraint slot'] and spit through it, hitting [the victim] in the arm." Hudson testified that through his peripheral vision he also saw defendant bend down, spit through the restraint slot, and hit the victim's arm with saliva. The victim, who was wearing a short-sleeved uniform, testified that the saliva landed on his right forearm and pant-leg area and that the saliva "was basically a spit spray." The victim further testified that the saliva was "[n]ot a big wad," did not contain phlegm or blood, and hit a section of him rather than just one spot. According to the victim, it was not possible for the substance on his arm to be water or something else from the shower because he saw defendant spit on him and because there were no other inmates in the shower cell besides defendant.
>
> The victim's supervisor, John Nicewicz, was standing in the vicinity when the incident happened. The victim testified that, as a reaction to being spat on, he walked over and told his supervisor because the supervisor needed to know about misconduct. Nicewicz testified that he was turned away and did not see defendant spit on the victim but that the victim told him that "he just got spat on." According to Nicewicz, the saliva "was basically clear" and "kind of looked like a spray or a mist." Nicewicz further testified that he believed that the substance was spit because the shower was not on and because it did not look like water. The victim testified that he made a written report of the misconduct and that Nicewicz took pictures of the areas containing saliva. Using a digital camera, Nicewicz took pictures of the victim's arm and pant leg, which were admitted at trial.

*People v. Richards*, 891 N.W.2d 911, 915-16 (Mich. Ct. App. 2016) *rev'd in part* 903 N.W.2d 555

(Mich. 2017). "The facts as recited by the Michigan Court of Appeals are presumed correct on

habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

The Michigan Court of Appeals reports that Petitioner filed numerous motions *in pro per* and changed attorneys several times during the pretrial phase of the criminal proceedings. *People v. Richards*, 891 N.W.2d at 916. Petitioner rejected his first appointed counsel and his request for new counsel was granted on April 22, 2014. *Id.* The week scheduled for Petitioner's trial, Petitioner rejected his second counsel and, once again, sought new counsel. At the June 3, 2014 hearing, the trial court asked Petitioner if he wanted to represent himself; Petitioner responded, "No." *Id.* The trial court appointed new counsel.

Petitioner filed a motion to replace his third counsel. On August 12, 2014, the court conducted a hearing on the motion. At the hearing, counsel represented that he and Petitioner had discussed the matter further and that Petitioner was withdrawing the motion.

On October 20, 2014, the Ionia County Circuit Court commenced Petitioner's trial. During *voir dire*, defense counsel informed the court that Petitioner wanted to represent himself. The trial judge refused Petitioner's request:

> [Defendant], I'm going to interrupt you because you are not representing yourself. We have had numerous pretrial motions in this matter and this is now the 3rd attorney who has been appointed to represent you. [Defense counsel] has worked very hard to accommodate your requests and to present those to the Court. The Court finds that your request to represent yourself is untimely. Again, you've had multiple opportunities to present this issue to the Court and so your request to represent yourself is denied here today.

*Id.* at 917. The trial proceeded and the jury found Petitioner guilty of the charged offense.

The trial court initially sentenced Petitioner to a term of imprisonment of 4 years, 2 months to 40 years. The court selected Petitioner's minimum sentence from within the minimum sentence range provided by the Michigan sentencing guidelines. Petitioner appealed his conviction and sentence. During the pendency of that appeal, Petitioner filed a motion for resentencing in the

trial court based on a scoring error relating to one of the offense variables. The prosecutor conceded the error.

Correction of the error pushed the 4-year, 2-month minimum sentence outside of the guidelines minimum sentence range. The prosecutor, however, argued that the trial court should depart from the guidelines and maintain the 4-year, 2-month minimum. Such a departure was facilitated by intervening changes in the law.

Between the court's initial imposition of sentence and the decision on Petitioner's motion for resentencing, the Michigan Supreme Court issued its decision in *People v. Lockridge*, 870 N.W.2d 502 (2015). The *Lockridge* decision made the previously mandatory Michigan sentencing guidelines discretionary. The trial court judge acknowledged this change and, exercising his discretion, kept Petitioner's minimum sentence at 4 years, 2 months even though that determination represented a departure from the Michigan sentencing guidelines.

Petitioner, through the brief he filed with the assistance of counsel and his *pro per* supplemental brief, raised in the Michigan Court of Appeals the issues he raises in this Court as habeas issues I, II, and III. He also raised an issue regarding his sentence. By opinion issued initially on April 26, 2016, and then approved for publication on June 7, 2016, the Michigan Court of Appeals rejected Petitioner's challenges and affirmed the trial court. *People v. Richards*, 891 N.W.2d 911 (Mich. Ct. App. 2016).

Petitioner, again with the assistance of counsel, filed an application for leave to appeal in the Michigan Supreme Court apparently raising the same issues he had raised in the court of appeals. The supreme court held the application in abeyance pending its decision in two other appeals that might resolve the issues that Petitioner raised with regard to his sentence. *People v. Richards*, 889 N.W.2d 258 (Mich. 2017). After the other appeals were decided, the supreme court

reversed the decision of the court of appeals regarding Petitioner's sentence and remanded the case to the court of appeals for reconsideration in light of the intervening decisions. In all other respects, however, the supreme court denied leave to appeal. *People v. Richards*, 903 N.W.2d 555 (Mich. 2017).

On remand, the Michigan Court of Appeals concluded that the trial court had not adequately explained its reasoning for departing from the guidelines when it resentenced—or, more accurately, did not resentence—Petitioner. *People v. Richards*, No. 325192, 2018 WL 662241 (Mich. Ct. App. Feb. 1, 2018). Accordingly, the appellate court vacated Petitioner's sentence and remanded to the trial court for resentencing. *Id.* On remand, the trial court resentenced Petitioner, abandoning the departure from the guidelines, choosing instead to reduce Petitioner's minimum sentence to 3 years, 10 months, the maximum minimum sentence that still fell within the minimum sentence range provided by the Michigan sentencing guidelines.

Petitioner, with the assistance of counsel, appealed his new sentence in the Michigan Court of Appeals raising three issues, essentially the same issues he raises in his petition as habeas issues IV, V, and VI. While his appeal was pending in the court of appeals, after briefing, but before oral argument, on January 25, 2019, Petitioner filed a habeas petition that raised four of his present six grounds for relief. *Richards v. Lesatz*, No. 2:19-cv-34 (W.D. Mich.) (*Richards I*) (Pet., ECF No. 1, PageID.6-10, 19, 22, 25, 29.) The Court dismissed the petition without prejudice because Petitioner had not exhausted his state court remedies before seeking habeas relief. *Richards I* (Judgment, ECF No. 15, PageID.127.)

A few months after his first petition was dismissed, the court of appeals rejected Petitioner's challenges to his sentence in an unpublished opinion issued July 23, 2019. *People v. Richards*, No. 344161, 2019 WL 3315363 (Mich. Ct. App. Jul. 23, 2019). Petitioner then filed a

*pro per* application for leave to appeal in the Michigan Supreme Court raising the same issues he raised in the court of appeals. By order entered January 2, 2020, the Michigan Supreme Court denied leave to appeal. *People v. Richards*, 936 N.W.2d 465 (Mich. Jan. 20, 2020). Petitioner did not file a petition for certiorari in the United States Supreme Court. (Pet., ECF No. 1, PageID.3.) Instead, having now exhausted his state court remedies, Petitioner timely filed this petition.

## II.    AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 574 U.S. 1, 4 (2014); *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013); *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012); *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly

established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## III. Discussion

### A. Self-representation

The Sixth Amendment provides that a criminal defendant shall have the right to the assistance of counsel for his defense. U.S. Const. amend. VI. At issue here is a corollary to that right, the right to self-representation. *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms."). The clearly established federal law regarding self-representation is expressed in two Supreme Court cases: *Faretta v. California*, 422 U.S. 806 (1975), and *Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152 (2000).

In *Faretta*, the Court found support for the right of self-representation in the structure of the Sixth Amendment right to the assistance of counsel:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

> The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many

areas. . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.

*Faretta*, 422 U.S. at 819-821 (footnotes and citations omitted).

Although the Court recognized a criminal defendant's right to self-representation, it acknowledged that the right was a qualified one. The Constitutional mandate to provide counsel to a criminal defendant is premised upon the fact that "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id*. at 834. Because a criminal defendant representing himself relinquishes that benefit, his waiver must be "'knowingly and intelligently'" made. *Id*. at 835. Moreover, the right to self-representation must yield to "'the dignity of the courtroom.'" Id. at 834 n.46. It is not a license to ignore the rules of procedure or engage in "obstructionist misconduct." *Id*.

In *Martinez*, 528 U.S. at 152, the Supreme Court concluded that the right of self-representation did not extend to appeals. In reaching its conclusion, the Supreme Court commented on the scope of the right of self-representation established in *Faretta*, stating:

As the *Faretta* opinion recognized, the right to self-representation is not absolute. The defendant must "'voluntarily and intelligently'" elect to conduct his own defense, and most courts require him to do so in a timely manner. He must first be "made aware of the dangers and disadvantages of self-representation." A trial judge may also terminate self-representation or appoint "standby counsel"—even over the defendant's objection—if necessary. We have further held that standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermin[e]" the "appearance before the jury" that the defendant is representing himself. Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal "chores" for the defendant that counsel would normally carry out. Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.

*Martinez*, 528 U.S. at 161-162 (citations and footnote omitted).

The court of appeals specifically referenced *Faretta* and *Martinez* in evaluating the trial court's rejection of Petitioner's request to represent himself. Additionally, the appellate court relied on *People v. Russell*, 684 N.W.2d 745 (Mich. 2004). *Russell*, in turn, relied on *People v. Anderson*, 247 N.W.2d 857 (Mich. 1976). In *Anderson*, the Michigan Supreme Court established three requirements that must be met before a criminal defendant in Michigan can proceed *pro se*:

> First, the request must be unequivocal . . . . Second, once the defendant has unequivocally declared his desire to proceed Pro se the trial court must determine whether defendant is asserting his right knowingly, intelligently and voluntarily. . . . The third and final requirement is that the trial judge determine that the defendant's acting as his own counsel will not disrupt, unduly inconvenience and burden the court and the administration of the court's business.

*Anderson*, 247 N.W.2d at 859-860. The *Anderson* court, however, drew its three requirements directly from the circumstances that swayed the *Faretta* court to recognize the right of self-representation. *Id.* at 859 ("[T]he [*Faretta*] Court carefully noted the circumstances under which Faretta was deprived of his constitutional right to conduct his own defense. The circumstances, affirmatively shown by the record, involved a clear and unequivocal request, weeks before trial, by a literate, competent, and understanding individual.") Thus, considering Petitioner's request for self-representation under *Russell* or *Anderson* is consistent with, and not contrary to, clearly established federal law.

The trial court concluded that the morning of trial was simply too late to accommodate Petitioner's request to represent himself. Accordingly, the trial court denied Petitioner's requests. The trial court's consideration of the timeliness of Petitioner's requests and concern regarding the delay that would follow from granting them is in no way contrary to clearly established federal law. In *Hill v. Curtin*, 792 F.3d 670 (2015) (*en banc*), the Sixth Circuit explained:

*Faretta* did not establish a bright-line rule for timeliness. Its holding does, however, necessarily incorporate a loose timing element. The *Faretta* Court explicitly stated that the defendant's request was "[w]ell before the date of trial," and "weeks before trial." It then held, "[i]n forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense." Thus, to the extent that *Faretta* addresses timeliness, as a matter of clearly established law it can only be read to require a court to grant a self-representation request when the request occurs weeks before trial.

Beyond this loose limit, the *Faretta* Court did not address timeliness . . . . Although lower courts have since established rules regarding when a defendant must assert his right, . . . the Supreme Court has never defined the precise contours of *Faretta*'s timing element. Nor did the Supreme Court announce any clearly established law on timeliness in *Martinez*. . . . Given the general standard articulated in *Faretta*, "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."

*Hill*, 792 F.3d at 678-79 (citations omitted, emphasis in original).

The *Hill* court reasoned further that "[a] trial judge may fairly infer on the day of trial—as the jurors are on their way to the courtroom—that a defendant's last-minute decision to represent himself would cause delay, whether or not the defendant requests a continuance." *Hill*, 792 F.3d at 162; *see also Jones v. Bell*, 801 F.3d 556, 564-65 (6th Cir. 2015) ("'[A]s a matter of clearly established law[, *Faretta*] can only be read to require a court to grant a self-representation request when the request occurs *weeks before trial*'—not on the morning of trial. The trial court's decision here was therefore not 'contrary to' *Faretta*'s holding, because Jones's request was made on the f*irst day* of trial, as opposed to weeks before trial.") (emphasis in original, citations omitted); *Walter v. Kelly*, 653 F. App'x 378, 386 (6th Cir. 2016) ("Courts have consistently held that requests made during or on the eve of trial are not timely."); *Floyd v. Haas*, No. 17-1295, 2017 WL 4182096, at *2 (6th Cir. Sept. 13, 2017) ("'[A] trial judge may fairly infer on the day of trial . . . that a defendant's last-minute decision to represent himself would cause delay,' and that such an inference is a reasonable basis on which to deny the request.") (citation omitted); *Hopson v. Gray*, No. 19-3709, 2019 WL 7757815, at *2 (6th Cir. Dec. 27, 2019) ("Hopson did

not . . . indicate any desire to proceed pro se until [the trial] began . . . . 'A trial judge may fairly infer on the day of trial . . . that a defendant's last-minute decision to represent himself would cause delay.'") (citation omitted).

In light of the latitude afforded to state courts in determining the timeliness of a self-representation request, denial of such a request on the morning of trial[1] is certainly not contrary to or an unreasonable application of clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on his claim that the trial court should have permitted Petitioner to represent himself.

### B. Destruction of evidence

Petitioner next contends that his due process rights were violated by the destruction of evidence. Petitioner complains that after the alleged spitting incident the victim wiped off his arm with a rag, disposed of the rag, and eventually washed the clothing that might have included spittle. As a result, Petitioner was left with no physical evidence to test and disprove the victim's accusation.

The clearly established federal law governing Petitioner's claim is set forth *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988), where the Court stated:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady* [*v. Maryland*, 373 U.S. 83(1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in [*California v.*] *Trombetta*, *supra*, 467 U.S., at 486, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents

---

[1] Petitioner contends that his request for self-representation was made known to the trial judge in chambers before trial. There is no support in the record for Petitioner's contention. Accordingly, the trial court's determination and the court of appeals' determination that Petitioner's request was presented for the first time at trial is reasonable on the record.

are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, *see Lisenba v. California*, 314 U.S. 219, 236 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Youngblood*, 488 U.S. at 57-58. The Court explained the meaning of bad faith as well. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56, n.*.

The Michigan Court of Appeals expressly applied the *Youngblood* standard in rejecting Petitioner's due process claim. The appellate court concluded that Petitioner had failed to show either that the evidence was exculpatory or that the victim acted in bad faith when he "destroyed" the evidence by cleaning himself and his clothes:

In this case, defendant failed to demonstrate that the evidence was exculpatory, as opposed to potentially exculpatory. The evidence would only be exculpatory if subject to tests that yielded favorable results. Defendant argues that the substance on the victim's arm was exculpatory because, if the substance had been preserved, testing could have ruled out defendant as a source or shown that the substance was water instead of saliva. While defendant testified that he did not spit at anyone and that water from the showerhead could have splattered off the floor and through the restraint slot, testimony from the corrections officers and police strongly supported that defendant spat on the victim. The victim testified that the substance on his arm was not water because he saw defendant spit on him. Hudson testified that the shower cell was a confined space, that defendant was the only inmate in the shower cell, and that he saw defendant spit on the victim. Hudson testified that the shower was off. Further, according to Nicewicz, the victim reacted and said that "he just got spat on." In addition, there was testimony that the saliva was "spit spray" and was "[n]ot a big wad," and, as the trial court alluded to, the sample may not have been able to be collected. For these reasons, defendant has shown only that the evidence was potentially exculpatory. *Id.* Therefore, defendant had to show bad

14

faith with respect to the failure to preserve. *Hanks*, 276 Mich.App. at 95, 740 N.W.2d 530.

With respect to bad faith, there is no indication on the record that the victim washed his arm off in bad faith. While defendant argues that the victim knowingly and intentionally destroyed the evidence and that not preserving evidence of misconduct violated the prison operating procedures, testimony was presented regarding what steps should be taken, in accordance with the operating procedures, to collect evidence in a case such as this one:

> We photograph it to maintain the evidence to show, in this case, in a courtroom what has happened and then we encourage the employees to clean quickly afterwards. Prisons have people with communicable diseases and there's a concern of getting it washed off as quickly as possible.

Further testimony revealed that the prison was not equipped to scrape saliva off one's arm and put it in a test tube for DNA purposes. The victim testified that he saw defendant spit on him, that he informed his supervisor, that he made a report of the misconduct, that he waited for his arm to be photographed, and that he washed his arm off with soap and water after the pictures were taken. The record simply does not support the assertion that the victim washed the saliva off his arm in bad faith. See *United States v. Garza*, 435 F.3d 73, 75 (C.A.1, 2006) (explaining that "conscious and deliberate" actions were not enough to show bad faith and that "[e]ven if, as found by the district court, [the police officer's] actions were 'short-sighted and even negligent,' this does not satisfy the requirement of bad faith"). See also *Johnson*, 197 Mich.App. at 365, 494 N.W.2d 873 (explaining that "the routine destruction of taped police broadcasts, where the purpose is not to destroy evidence for a forthcoming trial, does not mandate reversal").

In sum, because defendant has not met his burden of establishing that "the evidence was exculpatory or that the police acted in bad faith," *id.*, defendant's due-process claim based on the destruction of evidence is without merit [citation omitted].

*People v. Richards*, 891 N.W.2d at 922-23.

Because the court of appeals relied expressly on the *Youngblood* standard, Petitioner cannot show that the court's decision was "contrary to" clearly established federal law. Moreover, Petitioner has failed to show that the court of appeals unreasonably applied the standard. He has not identified any federal authority, much less clearly established federal law, that reached a different result on materially indistinguishable facts.

15

The Michigan Court of Appeals application of the *Youngblood* standard was eminently reasonable. The record, even as it is described by Petitioner, simply does not support a determination that the victim, the police, or the prosecutor knew that the "potentially useful" evidence was exculpatory. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### C.     Habitual offender enhancement

Petitioner next complains that the prosecutor failed to comply with the requirements for obtaining the habitual offender enhancement under Mich. Comp. Laws § 769.12. That enhancement was of particular significance because it increased Petitioner's maximum minimum sentence and increased his maximum sentence from 5 years to, potentially, life and actually, 40 years.

Petitioner notes that Mich. Comp. Laws § 769.13 governs the timing of notice of the prosecutor's intent to seek a habitual offender enhancement. He contends that the time for notice runs from arraignment. Petitioner claims that he did not receive the required notice until almost a year after he was arraigned. Petitioner cites state authorities for the proposition that violation of the statutory notice rules constitute a due process violation.

The Michigan Court of Appeals rejected Petitioner's claim. The appellate court explained that the arraignment that triggers the habitual offender enhancement notice is the "circuit court" arraignment—which in Petitioner's case occurred in February of 2014—not the arraignment on the warrant and complaint that occurred in April of 2013. Using the "circuit court" arraignment date, the appellate court determined that the prosecutor's habitual offender enhancement notice was timely.

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts

that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Petitioner's claim that he did not receive notice that complied with the Michigan habitual offender statute is a state-law claim. Moreover, it is a state-law claim that the state courts rejected. It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68 (1991). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Therefore, the state court's rejection of Petitioner's claim as meritless—effectively a determination that the prosecutor's notice here complied with the statute—binds this Court.

Although the prosecutor's compliance with the Michigan statute, a state-law issue, is conclusively resolved, the issue of constitutionally adequate notice remains. The Due Process Clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him so as to provide him an adequate opportunity to prepare his defense. *See*, *e.g*., *In re Ruffalo*, 390 U.S. 544 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir. 1977). This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. *Combs v. State of Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976). Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial. *Id*. "Beyond notice, a claimed deficiency in a state criminal indictment

is not cognizable on federal collateral review." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (quoting *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)). "An indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira*, 806 F.2d at 639. In other words, as long as "sufficient notice of the charges is given in some . . . manner" so that the accused may adequately prepare a defense, the Fourteenth Amendment's Due Process Clause is satisfied. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984); *Watson*, 558 F.2d at 338.

Petitioner cannot legitimately claim that he did not receive notice sufficient to permit him to defend against the habitual offender "charge" in this case. He acknowledges that he received the habitual offender notice in February of 2014, eight months before his trial. He does not contend that the notice was insufficient to permit him to adequately prepare a defense. Therefore, his claim does not implicate his due process notice rights.

Petitioner's base claim that the prosecutor failed to comply with the state statutory notice requirements to obtain a habitual offender sentence enhancement is a state-law claim not cognizable on habeas review. Moreover, the state appellate court's determination that Petitioner's state-law claim is meritless binds this court. Petitioner acknowledges receiving the statutory notice many months before his trial and does not contend that the notice he received was inadequate to permit him to prepare a defense. Accordingly, Petitioner has failed to show that the appellate court's rejection of his claim is contrary to, or an unreasonable application of, clearly established federal law, and he is not entitled to habeas relief on this claim.

### D. Petitioner's term of years sentence

Finally, Petitioner challenges his sentence of 3 years, 10 months to 40 years. He contends the sentence is not proportionate to the offense or the offender, that selecting the maximum possible minimum sentence is cruel and unusual for an offender with serious mental

health problems, and that selecting a 40-year maximum sentence is cruel and unusual for an offender with Asperger's syndrome.

Petitioner's argument regarding proportionality is based on the proportionality requirement set forth in *People v. Milbourn*, 461 N.W.2d 1 (Mich. 1990). Arguing that a sentence is disproportionate under *Milbourn*, 461 N.W.2d. 1, fails to raise a cognizable habeas claim. In *Milbourn*, the court held that a sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003). It is plain that *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). As previously discussed, a federal court may grant habeas relief solely on the basis of federal law and has no power to intervene on the basis of a perceived error of state law. *Bradshaw*, 546 U.S.at 76; *Pulley*, 465 U.S. at 41. Thus, Petitioner's claim based on *Milbourn* is not cognizable in a habeas corpus action.

The United States Constitution does not require strict proportionality between a crime and its punishment. *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S. 11, 36 (2003) (principle applies only in "'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality'") (quoting *Rummel v. Estelle*, 445 U.S. 263, 285

(1980)).  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Ordinarily, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).

Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls within the maximum penalty under state law.  Petitioner's sentence does not present the extraordinary case that runs afoul of the Eighth Amendment's ban of cruel and unusual punishment.  The appellate court's rejection of Petitioner's claims regarding proportionality and cruel and unusual punishment, therefore, are neither contrary to, nor an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief on his claims regarding his sentence.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated: __March 31, 2020__          /s/ Robert J. Jonker_____
                                     ROBERT J. JONKER
                                     CHIEF UNITED STATES DISTRICT JUDGE